**Richard Max STRAHAN, Plaintiff,**

v.

**Paul FRAZIER, Chief, Police Department, Town of Braintree, Massachusetts; William Sellgren; Karen MacAleese, Lieutenant, Police Department, Town of Braintree, Massachusetts; Richard Sanderson, Sergeant, Police Department, Town of Braintree, Massachusetts, Defendants.**

**No. CIV. A. 00–12355–WGY.**

United States District Court,
D. Massachusetts.

Aug. 1, 2001.

Adam F. Keats, Cambridge, MA, Pro se.

Richard Max Strahan, Cambridge, MA, Pro Se.

Katharine I. Goree, Kopelman & Paige, Barbara J. Saint Andre, Kopelman & Paige, Boston, MA, for Defendants

*MEMORANDUM*

YOUNG, Chief Judge.

## I. Introduction

Richard Max Strahan[1] ("Strahan") may be a latter day William Lloyd Garrison. Loud, obnoxious, irascible, contentious, obstreperous, and utterly contemptuous of court processes, when watching and listening to him, *see generally* Prelim. Inj. Hr'g Tr.; Mot. Hr'g Tr., one can hear Garrison say, "I am in earnest—I will not equivocate—I will not excuse—I will not retreat a single inch—AND I WILL BE HEARD." William Lloyd Garrison, *To the Public*, The Liberator, Jan. 1, 1831. Strahan is, of course, the paradigmatic measure of this Court's ability and willingness to protect the civil rights of all who come before it.

Strahan brings suit against the defendants, four officers of the Braintree Police Department (collectively, "the Police Defendants"), alleging that they improperly prevented him from gathering signatures

---

1. On November 14, 2000, this Court dismissed GreenWorld, an environmental association, without prejudice because it lacked representative counsel, a requirement for an organization to bring suit. Mem. & Order of Nov. 14, 2000, slip op. at 2.

for an initiative petition at the South Shore Plaza Shopping Mall ("the Plaza"), a private shopping mall.

Strahan's complaint sets forth three counts. Count I alleges that all of the Police Defendants violated the First, Fourth, and Fourteenth Amendments of the United States Constitution as well as rights under the Massachusetts constitution and seeks a remedy under 42 U.S.C. §§ 1983 and 1985;[2] Count II alleges that two of the Police Defendants violated the First, Fourth, and Fourteenth Amendments as well as rights under the Massachusetts constitution and seeks a remedy under section 1983; and Count III alleges that all of the Police Defendants violated the federal and state constitutions and seeks a remedy under the Massachusetts Civil Rights Act ("MCRA").

## II. Procedural Posture

On March 19, 2001, the Police Defendants moved for summary judgment on all counts of Strahan's complaint and to stay discovery pending resolution of their motion for summary judgment. On March 28, 2001, the Court granted the Police Defendants' motion to stay discovery. The Court scheduled a hearing for the summary judgment motion on April 12, 2001. Strahan failed to appear at this hearing, and the Court accordingly dismissed Strahan's suit for failure to prosecute.

On April 23, 2001, Strahan filed a motion for reconsideration of the Court's order of dismissal. On April 26, 2001, the Court

held a hearing on Strahan's motion for reconsideration and granted it as to Strahan because he was unable to attend the April 12, 2001 motion hearing. Because Strahan was not then prepared to oppose the Police Defendants' motion for summary judgment, the Court allowed Strahan fourteen days within which to file a written opposition to the Police Defendants' motion for summary judgment.

On May 15, 2001, Strahan filed his untimely written opposition to the Police Defendants' motion for summary judgment and an accompanying affidavit.[3] After consideration of Strahan's opposition, this Court, on June 25, 2001, granted in part and denied in part the Police Defendants' motion for summary judgment.[4] Pursuant to this Court's order of March 28, 2001, the stay of discovery was lifted on that same date. On July 9, 2001, the Police Defendants filed a motion for partial reconsideration, which the Court denied on July 23, 2001.

As this Court's order on June 25, 2001 set the case for a prompt trial, this memorandum sets forth the reasoning behind that order.

## III. Factual Background

### A. The Participants

Strahan is a conservation biologist who serves as the National Campaign Director of GreenWorld, an environmental association aimed at protecting endangered spe-

2. Although Strahan indicates in his complaint that he is suing under sections 1981 to 1985, Compl. ¶¶ 1, 19, only sections 1983 and 1985 set forth causes of action. Therefore, this Court limits its analysis to these two sections.

3. Although Strahan indicates that his affidavit is for purposes of Federal Rule of Civil Procedure 56(f), Pl.'s Opp'n at 11, it is more akin to an affidavit opposing summary judgment as it

sets forth his account of the events alleged in the complaint. Accordingly, the Court treats it as such.

4. Consistent with this holding, on July 11, 2001 this Court denied Strahan's motion for discovery pursuant to Federal Rule of Civil Procedure 56(f).

cies. Compl. ¶ 10;[5] Strahan Aff. ¶ 1. Over the last decade, GreenWorld has sponsored several proposed laws for placement on a state-wide election ballot through the initiative petition process set forth in the Articles of Amendment of the Massachusetts constitution. Strahan Aff. ¶ 3. In order to obtain support for its campaigns, GreenWorld's volunteers have been active in "public outreach"—"the peaceful communication of ideas and the concepts ... underlying [the] campaigns to members of the Public." *Id.* ¶ 2; *see* Compl. ¶ 10.

The Plaza is a privately owned shopping mall. Carr Aff. ¶ 2. Michael Carr ("Carr") is the Chief of Security at the Plaza, and has been employed there since 1991. *Id.* ¶ 1. According to Carr, the Plaza routinely allows groups and individuals to collect signatures for petitions in a peaceful manner, *id.* ¶ 2, but Strahan has caused a number of disturbances at the Plaza, *id.* ¶ 3 & Ex. A1 (providing incident reports). Carr asserts that Strahan has only been asked to leave the Plaza when he causes disturbances or harasses visitors; on these occasions, the Plaza has sought assistance from the Braintree Police Department. *Id.* ¶ 4.

Four Braintree police officers were involved in the events set forth in the complaint. Chief Paul Frazier ("Chief Frazier") is Chief of Police of the Town of Braintree. Compl. ¶ 5. Sergeant Richard Sanderson ("Sergeant Sanderson") has worked as a police officer for the Town of Braintree for twenty-four years. Sanderson Aff. ¶¶ 1–2. Officer William Sellgren ("Officer Sellgren") has served as a police officer for the Town of Braintree for thirty-seven years. Sellgren Aff. ¶¶ 1–2. Detective Lieutenant Karen MacAleese ("Lieutenant MacAleese") has been a police officer for the Town of Braintree for fourteen years. MacAleese Aff. ¶¶ 1–2.

While gathering signatures for initiative petitions, GreenWorld sometimes accepts donations to support its campaign activities. Compl. ¶ 12; Strahan Aff. ¶ 9. Strahan maintains that "[e]very shopping mall tries to unlawfully restrain [GreenWorld's] peaceful and unobtrusive initiative petition campaign in some weird and arbitrary manner." Strahan Aff. ¶ 5.

In 2000, GreenWorld was conducting an initiative petition campaign to place the Massachusetts Environmentally Safe Fishing Act on the state-wide election ballot. Compl. ¶ 11; Strahan Aff. ¶ 3. GreenWorld, and consequently Strahan, attempted to gather signatures for the initiative petition at several shopping malls. Compl. ¶ 12; Strahan Aff. ¶ 4.

With this background, the Court turns to the specific incidents set forth in the complaint and Strahan's affidavit.

**B.** *The 1992 Incident*

Strahan states that in or around 1992,[6] the Police Defendants, specifically Sander-

---

**5.** Because Strahan's complaint is verified, the Court treats it like an affidavit to the extent it satisfies the standards of Federal Rule of Civil Procedure 56(e). *Sheinkopf v. Stone*, 927 F.2d 1259, 1262 (1st Cir.1991); *JMTR Enters., L.L.C. v. Duchin*, 42 F.Supp.2d 87, 94 (D.Mass.1999); *see also* Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated

therein."). Thus, factual averments within the plaintiff's personal knowledge are equivalent to a counter-affidavit, whereas conclusory allegations do not pass muster under Rule 56(e) and hence must be disregarded. *Sheinkopf*, 927 F.2d at 1262.

**6.** Actually, Strahan has indicated that this incident has occurred in three different years, Mot. Hr'g Tr. at 13 (stating that the event occurred in 1993); Strahan Aff. ¶ 18 (describing the event as occurring in 1991); Strahan Aff. ¶¶ 17, 21 (indicating that the police inter-

son, arrested him for trespass and disorderly conduct simply for "peacefully gather[ing] signatures on an initiative petition." Strahan Aff. ¶ 18; *see also* Compl. ¶ 16. Strahan was then taken to the Braintree Police Department where he was taunted by the officers, including the Police Defendants. Strahan Aff. ¶ 19. According to Strahan, at his trial for this arrest, Braintree police officers falsely testified that they had arrested Strahan because a woman had complained that he had harassed her. *Id.* ¶ 20; *see also* Compl. ¶ 16. Strahan states that the court dismissed the charges against him. Strahan Aff. ¶ 20.

### C. *The October 31, 2000 Incident*

On October 30, 2000, Strahan contacted the Plaza's management office to inform the Plaza's manager that he would be collecting signatures for an initiative petition the next day, Compl. ¶ 14; Carr Aff. ¶ 5, and on October 31, 2000, Strahan arrived at the Plaza to collect his signatures, Compl. ¶ 14; Strahan Aff. ¶ 22. Because the parties' factual accounts of the events of October 31, 2000 differ dramatically, the Court sets forth both accounts separately.

### 1. *Strahan's Version*

When Strahan arrived at the Plaza on October 31, 2000, he went to the Plaza's management office to inform the management that he had arrived. Compl. ¶ 14; Strahan Aff. ¶ 23. Strahan asked to speak directly to the Plaza's manager about his petitioning "to establish a cooperative relationship," Compl. ¶ 14, and "hopefully [to] get his assurance that he would not immediately have [Strahan] arrested," Strahan Aff. ¶ 23. Strahan states that immediately

after he shook the Plaza manager's hand, the manager became irate and screamed "I know that you are going to ask for donations and if you do your [sic] going to be arrested. Simple as that. I'm not playing games with you. You don't get your way." [7] Compl. ¶ 14. Strahan indicates that he replied by informing the manager that he "was going to gather signatures in a peaceful manner and that [the manager] should not try and stop [him]." Strahan Aff. ¶ 23. Strahan then left the management office and attempted to begin petitioning. Compl. ¶ 14; Strahan Aff. ¶ 23. Several Plaza employees, however, physically blocked him from doing so. Compl. ¶ 14; Strahan Aff. ¶ 23.

Finding himself "in the middle of a police riot," Strahan Aff. ¶ 23, Strahan states that he decided that the best course of action would be to plead directly with Chief Frazier to allow him to continue to petition peacefully without police intervention. Strahan Aff. ¶ 23. Accordingly, Strahan called the Braintree Police Department several times in an attempt to prevent the Plaza employees from harassing him. Compl. ¶ 14. Sergeant Sanderson, as the watch commander that day, Sanderson Aff. ¶ 3, responded to Strahan's calls, Strahan Aff. ¶ 24; *see also* Compl. ¶ 14. Strahan asked to speak to Chief Frazier. Strahan Aff. ¶ 24. Strahan then appealed to both Sergeant Sanderson and Chief Frazier to protect his right to gather signatures. *Id.* The police were "very unsupportive" and threatened Strahan for using the 911 line. Compl. ¶ 14. In his complaint, Strahan indicates that Sergeant Sanderson shouted at him and stated that

---

ference with his petitioning began in 1992), necessarily resulting in this Court's vague description of the actual year of the incident.

**7.** Strahan's affidavit describes a slightly different verbal attack: "I am not going to take

any of your monkey business. I don't want you here. If you accept any donations I'm going to have you arrested and thrown out of here by the police." Strahan's Aff. ¶ 23.

"soliciting is illegal and you will [be] arrested for trespass if you try and do it." *Id.* Strahan's affidavit describes the conversation in more detail:

He loudly told me that I had no right to ask people to sign petitions or ask for donations at South Shore Plaza. He said that I could only do so if the management let me. He also told me that he remembered me and that I was a scam artist and if he saw me asking for donations he would arrest me personally for fraud. He then told me that he was going to send someone over to arrest me. He explained to me that it was the official policy of the Braintree police department that no one could collect signatures on ballot question[s] at South Shore Plaza unless the management allowed it. He said that anyone would be arrested for trespassing at South Shore Plaza who was there after being told to leave by the management, regardless of the reason. He also threatened me with arrest for simply calling on a 911 line.

Strahan Aff. ¶ 24.

Fearing imminent arrest, Strahan decided to do as little as possible to provoke the police into harming him. *Id.* ¶ 26. He moved his table closer to pedestrian traffic, displayed his campaign materials and ballot sheets, and began gathering signatures. *Id.* ¶ 27. While Strahan was peacefully gathering signatures (and not collecting donations), two officers, Officer Sellgren and Lieutenant MacAleese, "attacked" him. Compl. ¶ 15; Strahan Aff. ¶ 27. They immediately told Strahan to "pack up and leave," Compl. ¶ 15, and that he "was being kicked out of the shopping mall and that [he] was in custody," Strahan Aff. ¶ 28. Then Officer Sellgren told Strahan that "solicitation is illegal and you can't do it." Compl. ¶ 15; *accord* Strahan Aff. ¶ 28. Strahan told the officers that he had the right to gather signatures and that

he was not collecting donations, Compl. ¶ 15; *accord* Strahan Aff. ¶ 28, but the officers replied that "It doesn't matter if its soliciting signatures or money, solicitation is unlawful and you got to go." Compl. ¶ 15; *accord* Strahan Aff. ¶ 28.

The two police officers ordered Strahan out of the Plaza and threatened him with immediate arrest if he did not leave right away. Compl. ¶ 15. Specifically, Lieutenant MacAleese said that "you got no right to petition if they [mall management] don't want you here. Either leave or I'm going to arrest you." *Id.* (alteration in original). Lieutenant MacAleese further threatened that if Strahan ever returned he would be arrested. *Id.;* Strahan Aff. ¶ 28.

Strahan's complaint merely indicates that he left the Plaza because he felt intimidated, threatened, and coerced. Compl. ¶ 15. In his affidavit, however, Strahan further alleges that "[t]he Defendants then pulled out their handcuffs and said, 'let's go'" and that the police officers then "came around the table and physically corralled [him] and forced [him] out of South Shore Plaza." Strahan Aff. ¶ 28.

According to Strahan, the Plaza's management said nothing to him directly, and all of the police interactions were instigated by the police, not the Plaza's management. Compl. ¶ 15.

Strahan also indicates that after he was removed from the Plaza, he again called the Braintree Police Department and spoke to Lieutenant MacAleese. Strahan Aff. ¶ 29. According to Strahan, Lieutenant MacAleese stated that she would arrest him and anyone else from Green-World for trespass if they ever returned to the Plaza. *Id.* She then hung up the phone. *Id.*

### 2. *The Police Defendants' Version*

On October 31, 2000, when Strahan arrived at the Plaza's management office,

Chief of Security Carr observed Strahan yelling at the Plaza's general manager. Strahan was upset by the placement of the table that the Plaza had provided for him, and was displeased because the Plaza's general manager had asked him not to collect donations. Carr Aff. ¶ 6. Strahan threatened to sue the general manager and promptly departed the management office. *Id.* Carr observed Strahan walk to a pay phone, from which Carr later learned that Strahan had called the Braintree Police Department. *Id.* ¶ 7.

Sergeant Sanderson received Strahan's 911 call, during which Strahan complained that the Plaza security officers were preventing him from obtaining signatures on a petition. Sanderson Aff. ¶¶ 3–6. Sergeant Sanderson asked Strahan whether he was merely getting signatures or also soliciting money, because Sergeant Sanderson was aware of past disturbances that Strahan had caused while attempting to collect money from customers. *Id.* ¶ 7. Strahan then "became verbally abusive and raised his voice, arguing that his rights were being violated." *Id.* ¶ 8. Sergeant Sanderson reminded Strahan that he was "permitted to peacefully collect signatures, but not to solicit donations or cause a disturbance," but Strahan continued to be verbally abusive until Sergeant Sanderson ultimately terminated the call. *Id.* ¶¶ 9–10. Sergeant Sanderson then dispatched Officer Sellgren to investigate the situation. *Id.* ¶ 11; Sellgren Aff. ¶ 3.

Strahan called the police several more times, alleging that Plaza security was restraining him and violating his rights. Sanderson Aff. ¶ 12. Further conversation during these calls was impossible because Strahan was being verbally abusive and would not allow Sergeant Sanderson to speak; Sergeant Sanderson advised Strahan, however, that an officer had been dispatched. *Id.*

Carr observed Strahan leave the pay phone and set up his table. Carr Aff. ¶ 8. Carr continued to observe Strahan to prevent Strahan from repeating his past disturbances at the Plaza. *Id.*

Shortly after Strahan called the police, Officer Sellgren arrived and observed Strahan arguing loudly with members of the Plaza security force. Sellgren Aff. ¶ 4. Officer Sellgren then questioned Carr and other members of the Plaza security team to determine what had happened. Carr Aff. ¶ 9; Sellgren Aff. ¶ 5. Carr informed Officer Sellgren that Strahan had caused a disturbance that morning and that he had repeatedly caused disturbances in the past. Carr Aff. ¶ 9; Sellgren Aff. ¶ 5. Strahan continuously interrupted the conversation in a raised voice and then argued with Officer Sellgren. Carr Aff. ¶ 10; Sellgren Aff. ¶ 7. Plaza security also informed Officer Sellgren that Strahan was permitted peacefully to collect signatures for his petition, but that he had been harassing visitors. Sellgren Aff. ¶ 5.

Lieutenant MacAleese was conducting a surveillance at the Plaza when she heard on her radio that there was a disturbance at the Plaza and responded. MacAleese Aff. ¶ 3. Lieutenant MacAleese arrived at some point during the argument between Strahan and Officer Sellgren. Carr Aff. ¶ 11; Sellgren ¶ 8; MacAleese Aff. ¶ 4.

Carr told both Lieutenant MacAleese and Officer Sellgren that Strahan was allowed to collect signatures peacefully, but that he was causing a disturbance; he asked them to direct Strahan to leave because he was disturbing the peace and trespassing. Carr Aff. ¶ 12; Sellgren Aff. ¶¶ 5–6; MacAleese Aff. ¶ 5. Strahan told Lieutenant MacAleese that Plaza security had restrained him and prevented him from collecting signatures. MacAleese Aff. ¶ 7. Lieutenant MacAleese informed Strahan that because he was not collecting

signatures in a peaceful manner and had caused a disturbance, the property owner requested that he leave the premises. Sellgren Aff. ¶ 9; MacAleese Aff. ¶ 8. In a loud voice, Strahan threatened to sue Lieutenant MacAleese and Officer Sellgren for violating his rights and then left. MacAleese Aff. ¶¶ 9–10; Sellgren Aff. ¶¶ 10–11; Carr Aff. ¶¶ 13–14.

Neither Lieutenant MacAleese nor Officer Sellgren touched Strahan or advised him that he was not free to leave. MacAleese Aff. ¶ 8; *see also* Carr Aff. ¶ 13 ("At no time did I observe the police officers touch Mr. Strahan or take his materials.").

## IV. Analysis

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Thus, the moving party bears the burden of proving that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the nonmoving party bears the burden of proof on the merits, it is sufficient for the moving party to show an absence of evidence in support of the nonmoving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

To survive a motion for summary judgment, the nonmoving party must show the existence of a genuine dispute as to a material fact. The nonmoving party "may

not rest upon the mere allegations or denials of [its] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. "Only disputes over facts that might affect the outcome of the suit under the governing law" are material and hence serve to "properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputes are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, summary judgment should be denied when there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249–52, 106 S.Ct. 2505.

In determining whether summary judgment is appropriate, all justifiable inferences should be drawn in favor of the nonmoving party, *id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), and the Court should apply the substantive evidentiary standard of proof that would apply at the trial on the merits, *id.* at 252.

### B. *The Right to Petition in a Private Shopping Mall*

#### 1. *The United States Constitution and the First Amendment*

The Police Defendants argue that Strahan cannot seek a remedy under either section 1983 or the Massachusetts Civil Rights Act for a violation of his First Amendment rights because the Supreme Court has held that there is no First Amendment right to exercise free speech in private shopping malls. Defs.' Mem. at 10–11. In opposition, Strahan argues—in a section entitled "Wishful Thinking"— that there should be such a First Amendment right. Pl.'s Opp'n at 1–8. In es-

sence, Strahan contends that the protections of the First Amendment should be extended to reach private action and private property.

The Supreme Court has long wavered as to whether there is a First Amendment right to exercise free speech in private shopping malls. The Supreme Court first addressed the issue in *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968) (Marshall, J.). *Logan Valley* considered whether individuals have a First Amendment right peacefully to picket a business enterprise located within a private shopping mall. *Id.* at 309, 88 S.Ct. 1601. In addressing this issue, the Supreme Court drew strongly from its opinion in *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (Black, J.), in which the Supreme Court held that a company-owned town could not deny its inhabitants free speech under the First Amendment solely because a private company owned title to the town, *id.* at 509, 66 S.Ct. 276. *Marsh* explained that "[o]wnership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Id.* at 506, 66 S.Ct. 276.

In *Logan Valley*, the Supreme Court analogized the private shopping mall to the company-owned town in *Marsh*, stating that the shopping mall was the "functional equivalent of the business district" of the company-owned town. *Logan Valley*, 391 U.S. at 318, 88 S.Ct. 1601. Relying on *Marsh*, the Supreme Court held that there was a First Amendment right peacefully to picket in a private shopping mall "in a manner and for a purpose generally consonant with the use to which the property is actually put." *Id.* at 319–20, 88 S.Ct. 1601.

Justice Black, the author of *Marsh*, wrote a strong dissenting opinion in *Logan Valley*. Justice Black criticized the majority's attempt to liken *Marsh*'s company-owned town to a private shopping mall:

> I respectfully suggest that [the majority's] reasoning completely misreads *Marsh* and begs the question. The question is, Under what circumstances can private property be treated as though it were public? The answer that *Marsh* gives is when that property has taken on all the attributes of a town, i.e., residential buildings, streets, a system of sewers, a sewage disposal plant and a business block on which places are situated. I can find nothing in *Marsh* which indicates that if one of these features is present, e.g., a business district, this is sufficient for the Court to confiscate a part of an owner's private property and give its use to people who want to picket on it.

*Id.* at 332, 88 S.Ct. 1601 (Black, J., dissenting) (citations and quotation marks omitted).

Justice Black's dissenting viewpoint in *Logan Valley* ultimately carried the day in *Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972) (Powell, J.). In *Lloyd*, the Supreme Court considered whether individuals have a First Amendment right to distribute handbills in a private shopping mall when the handbills are unrelated to the shopping mall's operations. *Id.* at 552. *Lloyd* limited *Logan Valley* to its facts, stating that *Logan Valley* held only that the First Amendment protects speech in private shopping malls that is "generally consonant with the use to which the property is actually put," *Logan Valley*, 391 U.S. at 319–20, 88 S.Ct. 1601, and expressly reserved the question whether the First Amendment protected speech in a private shopping mall when the speech is not "directly related in its pur-

pose to the use to which the shopping center property was being put," *id.* at 320 n. 9, 88 S.Ct. 1601. *Lloyd,* 407 U.S. at 559–60, 92 S.Ct. 2219.

In limiting *Logan Valley* to its facts, the Supreme Court adopted Justice Black's reasoning that *Marsh* did not warrant the more general holding that private shopping malls are equivalent for First Amendment purposes to public areas in the same way that a company-owned town is. *Lloyd,* 407 U.S. at 562–63, 92 S.Ct. 2219. Thus, *Lloyd* rejected the proposition that a private shopping mall, by being open to the public, somehow morphs into an area available for public use and hence subject to the First Amendment:

> The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use. The closest decision in theory, *Marsh* ..., involved the assumption by a private enterprise of all of the attributes of a state-created municipality and the exercise by that enterprise of semiofficial municipal functions as a delegate of the State. In effect, the owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State. In the instant case [t]here is no comparable assumption or exercise of municipal functions or power.
>
> Nor does property lose its private character merely because the public is generally invited to use it for designated purposes.... The essentially private character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center.

> \*　　\*　　\*　　\*　　\*　　\*

We hold that there has been no such dedication of Lloyd's privately owned and operated shopping center to public

use as to entitle respondents to exercise therein the asserted First Amendment rights.

*Id.* at 569–70, 92 S.Ct. 2219. As a result, the Supreme Court held that the First Amendment does not protect speech in private shopping malls when that speech is unrelated to the shopping mall's operations and when there are adequate alternative avenues of communication. *Id.* at 563–64, 570, 92 S.Ct. 2219.

In *Hudgens v. NLRB,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) (Stewart, J.), the Supreme Court, no doubt sensing the lingering tension between its holding in *Lloyd* and *Logan Valley,* expressly held that *Lloyd* had overruled *Logan Valley:*

> The Court in its *Lloyd* opinion did not say that it was overruling the *Logan Valley* decision. Indeed a substantial portion of the Court's opinion in *Lloyd* was devoted to pointing out the differences between the two cases, noting particularly that, in contrast to the handbilling in *Lloyd,* the picketing in *Logan Valley* had been specifically directed to a store in the shopping center and the pickets had had no other reasonable opportunity to reach their intended audience. But the fact is that the reasoning of the Court's opinion in *Lloyd* cannot be squared with the reasoning of the Court's opinion in *Logan Valley.*

> ·　　·　　·　　·　　·

> If a large self-contained shopping center is the functional equivalent of a municipality, as *Logan Valley* held, then the First and Fourteenth Amendments would not permit control of speech within such a center to depend upon the speech's content.

*Id.* at 517–20, 96 S.Ct. 1029.

 Thus, despite its vacillating roots, the Supreme Court's stance on the subject is clear: The First Amendment

does not protect petitioning in private shopping malls. The Plaza is functionally equivalent to the mall at issue in *Lloyd* itself, leading this Court to the inevitable conclusion that the Plaza is essentially private and hence not subject to the First Amendment.[8] Nor is the Plaza the only forum available for Strahan effectively to convey his message and collect his signatures: Strahan is free to petition on public streets and sidewalks and in public parks and buildings. *Lloyd,* 407 U.S. at 564, 92 S.Ct. 2219.

In short, Strahan's "wishful thinking" is just that. This Court cannot ignore the Supreme Court's clear mandate in *Lloyd* and *Hudgens* that the sphere of First Amendment protection falls short of the right to petition in a private shopping mall. For this reason, the Court granted summary judgment to the Police Defendants as to Strahan's claims under section 1983 alleging that his First Amendment rights were violated during both the 1992 and 2000 incidents (Counts I and II).

### 2. The Massachusetts Constitution [9]

The Supreme Court added one last twist to its stance on free speech in private shopping malls in *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). In *Prune-Yard,* the Supreme Court considered whether state constitutional provisions, which permit individuals to exercise free speech and petition rights on the property of a privately owned shopping center to which the public is invited, violate the shopping center owner's property rights under the Fifth and Fourteenth Amendments or his free speech rights under the First and Fourteenth Amendments.

*Id.* at 76–77, 100 S.Ct. 2035. *PruneYard* confirmed that the First Amendment does not protect petitioning in private shopping malls, *id.* at 80–81, 100 S.Ct. 2035, but it also indicated that *Lloyd* did not place an independent limit on the authority of the *state* to provide a broader range of constitutional protections than the federal constitution, *id.* at 81, 100 S.Ct. 2035. *Prune-Yard* went on to hold that a state-imposed right to petition in private shopping malls (within reasonable time, place, and manner restrictions) was neither a taking nor a violation of the shopping mall owner's First Amendment rights. *Id.* at 88, 100 S.Ct. 2035.

Thus, under *PruneYard,* the Court's inquiry into the right to petition in a private shopping mall does not end with the First Amendment. Rather, the Court must also examine whether the Massachusetts constitution provides Strahan a right to petition in a private shopping mall.

---

**8.** Strahan suggests that the Plaza is subject to the First Amendment to the extent it relies upon the police to arrest trespassing petitioners. Pl.'s Opp'n at 5–6. The argument is misguided. Given that there is no First Amendment right to petition in a private shopping mall, police involvement in removing individuals who attempt to do so cannot create a First Amendment right when none existed before. *Cape Cod Nursing Home Council v. Rambling Rose Rest Home,* 667 F.2d 238, 243 (1st Cir.1981). "This bootstrap argument would turn any arrest in support of private rights into state action, thereby eviscerating the requirement." *Id.* Thus, police participation in enforcing a private mall own-er's decision to disallow free speech does not raise First Amendment questions.

**9.** Taking into account "concerns of comity, judicial economy, convenience, fairness, and the like," *Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 257 (1st Cir.1996), this Court chose to exercise supplemental jurisdiction over Strahan's claim under the Massachusetts Civil Rights Act, *despite the fact that it raises a new issue of state law, see* 28 U.S.C. § 1367(c)(1), because the parties requested that the Court do so, trial is quickly approaching, and there is a remaining claim arising under federal law.

In *Batchelder v. Allied Stores International, Inc.*, 388 Mass. 83, 445 N.E.2d 590 (1983), the Supreme Judicial Court addressed the extent to which the Massachusetts constitution creates a free speech right to petition in the common areas of private shopping malls, *id.* at 84, 445 N.E.2d 590. More specifically, *Batchelder* addressed the limited question whether individuals have a "right . . . to solicit signatures in the mall area of a large, private shopping center in support of a candidate's nomination to public office." *Id.*

The Supreme Judicial Court concluded that

> any person seeking signatures in connection with access to the ballot, and distributing material associated therewith, has a right under art. 9 [10] of the Declaration of Rights to do so, in a reasonable and unobtrusive manner, in the common areas of a large shopping mall, subject to reasonable regulations adopted by the mall owner.

*Id.*

In reaching this conclusion, the Supreme Judicial Court found it significant that Ar-

ticle 9, which concerns the freedom and equality of elections, is not by its terms directed only against state action. *Id.* at 88, 445 N.E.2d 590. Without such a state action requirement, Article 9, unlike the First Amendment, is not limited to protecting against governmental abridgement of speech. *Id.* at 88–89, 445 N.E.2d 590.

The Supreme Judicial Court, however, declined to consider whether Articles 16 [11] and 19,[12] which set forth the rights to free speech and freedom of assembly, respectively, similarly are not limited to protecting against government action.[13] The Supreme Judicial Court specifically limited its holding to Article 9 of the Massachusetts Declaration of Rights, declining to decide the scope of protection under Articles 16 and 19:

> It is important that we carefully define the issue that this case presents. We are concerned with ballot access and not with any claim of a right to exercise free speech rights apart from the question of ballot access. Ballot access is of fundamental importance in our form of gov-

---

**10.** Article 9 of the Massachusetts Declaration of Rights provides that "[a]ll elections ought to be free; and all inhabitants of this commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employments." Mass. Const. Pt. 1, Art.. 9.

**11.** Article 16 of the Massachusetts Declaration of Rights provides that "[t]he liberty of the press is essential to the security of freedom in a state: it ought not, therefore, to be restrained in this commonwealth. The right of free speech shall not be abridged." Mass. Const. Pt. 1, Art. 16.

**12.** Article 19 of the Massachusetts Declaration of Rights provides that "[t]he people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good; give instructions to their representa-

tives, and to request of the legislative body, by the way of addresses, petitions, or remonstrances, redress of the wrongs done them, and of the grievances they suffer." Mass. Const. Pt. 1, Art. 19.

**13.** Although the Supreme Judicial Court declined to decide whether Articles 16 and 19, like Article 9, have no state action requirement, it did explain that its prior cases had not conclusively decided the question. *Batchelder*, 388 Mass. at 89, 445 N.E.2d 590 n. 8. (limiting *Commonwealth v. Noffke*, 376 Mass. 127, 379 N.E.2d 1086 (1978), which arguably held that Articles 16 and 19 have a state action requirement, on the grounds that *Noffke* involved the parking lot of a private hospital as opposed to a large shopping mall, and *Noffke* was decided before *PruneYard*, which made clear that states could fashion rights of expression in the context of private shopping malls).

ernment because through the ballot the people can control their government. In limiting our decision to the matter of soliciting signatures on ballot questions, we leave to another day the question of rights that may arise under art. 16 (free speech).

*Id.* at 91–92, 445 N.E.2d 590 (citations omitted). Thus, the Supreme Judicial Court emphasized that its holding did not extend beyond "ballot questions."

The Police Defendants argue that Strahan has no right under Article 16 or 19 to solicit signatures in a private shopping mall. Accordingly, they urge this Court to read *Batchelder* narrowly as applying "solely in the context of a ballot petition under Article 9." Defs.' Mem. at 15. Strahan, in contrast, urges this Court to extend the *Batchelder* holding to Articles 16 and 19 in order to encompass all free speech, Pl.'s Opp'n at 14–15.

The Court adopts neither approach. On the one hand, the Police Defendants' narrow reading of *Batchelder* is unwarranted in light of the strong similarity between ballot access for candidates and ballot access for proposed legislation. On the other hand, the Court need not extend *Batchelder* to Articles 16 and 19 as Strahan urges in order to recognize that the Massachusetts constitution protects the right to petition in a private shopping mall for the purpose of placing proposed legislation on the ballot. The Court, therefore, adopts an intermediate approach that narrowly and easily extends the reasoning of *Batchelder* to apply to Article 48 of the

Articles of Amendment of the Massachusetts Constitution.[14]

■ Article 48 of the Articles of Amendment sets forth provisions for allowing citizens to fashion laws using initiative petitions and referenda: "[T]he people reserve to themselves the popular initiative, which is the power of a specified number of voters to submit constitutional amendments and laws to the people for approval or rejection; and the popular referendum, which is the power of a specified number of voters to submit laws, enacted by the general court, to the people for their ratification or rejection." Mass. Const. Amend. Art. 48, pt. 1.

The strong similarity between the right to individual ballot access and the right to the initiative petition supports extending *Batchelder*'s reasoning to Article 48. First, like Article 9, Article 48 is not limited to protecting against governmental abridgement. Rather, it creates a right in the people to submit laws and amendments to the citizenry for approval; it does not speak to whether only the state is restricted from infringing on that right.

Second, the reasoning upon which *Batchelder* relied to protect the right to collect signatures in private shopping malls for ballot access under Article 9 is equally applicable to Article 48. *Batchelder*, in holding that Article 9 protects the right to collect ballot signatures in private shopping malls, relied in large part on the nature of ballot access and the necessity of personal contact in obtaining ballot signatures:

---

**14.** Although Strahan specifies in his complaint only that the Police Defendants' conduct was in violation of Articles 16 (free speech) and 19 (freedom of association), because he is pro se, this Court liberally construes his pleadings to state a violation of the appropriate constitutional provision. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (holding that pro se litigants are entitled to liberal construction of their pleadings); *Strahan v. Coxe,* 127 F.3d 155, 158 n. 1 (1st Cir.1997) (citing *Haines*). Indeed, Strahan relies on the reasoning of *Batchelder* in both his complaint, Compl. ¶ 20, and his opposition to the Police Defendants' summary judgment, Pl.'s Opp'n at 12.

The concept of free elections and an equal right to be elected "for public employments" embodied in art. 9 supports our conclusion that Batchelder has a constitutional right to solicit signatures at the North Shore Shopping Center. The difference between free speech and art. 9 rights to free elections and to be a candidate equally with others is not purely theoretical. Ideas and views can be transmitted through the press, by door-to-door distributions, or through the mail, without personal contact. On the other hand, a person needing signatures for ballot access requires personal contact with voters. He or she cannot reasonably obtain them in any other way. Reasonable access to the public is essential in ballot access matters.

*Batchelder*, 388 Mass. at 92, 445 N.E.2d 590. The same need for personal contact is equally necessary to obtain signatures for an initiative petition. Indeed, the right to place legislation on the ballot is arguably even more tied up with an individual's ability to reach the public than candidacy petitions. *See Meyer v. Grant*, 486 U.S. 414, 421–22, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) ("[C]irculation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.' ").

Although *Batchelder* was unwilling to protect all speech in private shopping malls, it recognized the importance of such access in the context of obtaining individual access to the ballot. The analogy between individual ballot access and initiative petitions is too strong for this Court to ignore—both require personal contact and reasonable access to the public, which the Supreme Judicial Court has held requires protection of a right to petition in private shopping malls. Therefore, even though *Batchelder* limited its holding to Article 9, this Court concludes that its reasoning is equally applicable to Article 48. Strahan has the right to collect signatures for his initiative petition in a private shopping mall.

■ Strahan's right to collect signatures for an initiative petition is not, however, without its limits. *Batchelder* did not ignore the property interests of the private mall owner. The Supreme Judicial Court recognized that property owners could establish reasonable time, place, and manner restrictions on such a right. *Batchelder*, 388 Mass. at 92, 445 N.E.2d 590. Accordingly, the court limited the scope of such a right to petition by requiring that it be carried out in an "unobtrusive and reasonable" manner and only in the common areas of the shopping mall. *Id.*

■ Because Strahan's right to collect signatures for an initiative petition is limited to unobtrusive and reasonable behavior, whether Strahan was soliciting in this manner is a material issue of fact. As a result, the diametrically opposed versions of the events of October 31, 2000 present a genuine dispute of material fact. Accordingly, this Court denied the Police Defendants' motion for summary judgment as to Strahan's claim under the Massachusetts Civil Rights Act for a violation of his state constitutional rights.[15]

---

**15.** The Court does not now resolve whether the right to gather signatures for an initiative petition extends to the gathering of donations. Although *Batchelder* held that the right to seek signatures in connection with access to the ballot includes the right to distribute material associated therewith, *Batchelder*, 388 Mass. at 84, 445 N.E.2d 590, it did not discuss whether the right encompasses soliciting donations. Because it is unclear whether the parties in the instant case dispute whether Strahan was actually collecting donations on October 31, 2001, the Court does not now resolve this issue of law.

The fact that Strahan is able to point to a state constitutional right to petition in a private shopping mall, however, does not create a remedy under section 1983. By its own terms, section 1983 only creates a remedy for federal statutory and constitutional violations—not state constitutional violations. 42 U.S.C. § 1983 ("Every person who, under color of [state law] subjects ... any ... person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...."); *cf. Ahern v. O'Donnell*, 109 F.3d 809, 815 (1st Cir.1997) (per curiam) (section 1983 applies to violations of federal, not state, law). Accordingly, the Court granted summary judgment to the Police Defendants as to Strahan's claim under section 1983 for a violation of the Massachusetts constitution.

### C. *The Fourth Amendment*

#### 1. *The 1992 Incident*

Strahan argues that his arrest in 1992 was without probable cause and hence in violation of the Fourth Amendment. This Court recognized at the hearing for reconsideration of the Court's order of dismissal that, taking Strahan's allegations in his verified complaint as true, he stated a claim that this 1992 arrest violated his Fourth Amendment rights. Hr'g Tr. at 6–8; *see also* Compl. ¶ 16 ("Strahan was arrested once before by the Defendants for simply refusing to stop peacefully gathering signatures in the Shopping Mall.... He was threatened with arrest based on someone simply complaining that Strahan criticized [her] ... while he was peacefully gathering signatures."). Strahan's verified complaint did not, however, state in what year 'this incident occurred. Strahan informed the Court at the hearing that this

incident occurred in 1993. Strahan's affidavit confirmed that the arrest occurred in or around 1992. Strahan Aff. ¶¶ 18, 20.

■ A claim under section 1983 for a violation of the Fourth Amendment has a three-year statute of limitations. *Street v. Vose*, 936 F.2d 38, 39–40 (1st Cir.1991) (per curiam); *see also* Mass. Gen. Laws ch. 260, § 2A. As the incident occurred, at the latest, in 1992 or 1993, and Strahan did not file this suit until 2000, his claim is untimely. *Nieves v. McSweeney*, 241 F.3d 46, 51 (1st Cir.2001) (holding that even when a continuing conspiracy to violate civil rights is alleged, "the statute of limitations runs separately from the occurrence of each civil rights violation").

This Court has the authority to narrow the issues for trial under Federal Rules of Civil Procedure 16 and 56. *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1568 (1st Cir.1994); *see also* Fed.R.Civ.P. 16(c)(1) ("[T]he court may take appropriate action, with respect to ... the formulation and simplification of the issues, including the elimination of frivolous claims or defenses."). Strahan was on notice that the Court would consider his claim untimely if it became apparent that the incident actually occurred in 1993 or earlier. Hr'g Tr. at 14 (informing Strahan that if, in fact, the incident occurred in 1993 it would be untimely, but that this arrest could be used as evidence of a course of conduct at trial); *id.* at 16 (informing Strahan that the Court may "extinguish the claim [as to this prior incident] if there's no basis for going forward"). Strahan can point to nothing that would support the conclusion that his claim is timely. In these circumstances, the Court has the authority to narrow the issues for trial pursuant to Rules 16 and 56.[16]

---

16. The First Circuit laid out the requirements for sua sponte summary judgment in *Rogan v.*

*Menino*, 175 F.3d 75 (1st Cir.), *cert. denied*

Therefore, this Court granted summary judgment to the Police Defendants as to Strahan's claim under section 1983 for a violation of his Fourth Amendment rights based on the 1992 incident.[17]

### 2. *The October 31, 2000 Incident*

The Police Defendants argue that, as matter of law, Strahan has not stated a Fourth Amendment violation because none of the alleged police conduct was of sufficient degree to trigger the Fourth Amendment. At most, they argue, Strahan was merely threatened with arrest. These threats alone, the Police Defendants contend, do not trigger the Fourth Amendment because they do not constitute a seizure under the Fourth Amendment. Defs.' Mem. at 11–13.

In his affidavit, however, Strahan indicates that the Police Defendants not only threatened him with arrest, but also *physically* removed him from the Plaza. Strahan states that after being threatened with arrest, Lieutenant MacAleese and Officer Sellgren "pulled out their handcuffs and said, 'let's go.'" Strahan Aff. ¶ 28. The officers then proceeded to walk behind the table toward Strahan and "physically corralled" him and "forced" him out of the Plaza. *Id.*

The First Circuit has divided Fourth Amendment claims into three tiers of Fourth Amendment analysis. *United States v. Young*, 105 F.3d 1, 5 (1st Cir. 1997). The first or lowest tier involves instances in which there is no search or seizure. *Id.* at 5–6. When there is neither a search nor a seizure, the Fourth Amendment is not triggered at all. *Id.* "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *see also United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality) (setting forth the "free to leave" test); *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

According to Strahan's version of the incident, the Police Defendants forcibly removed him from the Plaza. Indeed, the Court could reasonably infer that Strahan was actually handcuffed and then removed from the premises. Such a show of physical force constitutes a seizure and triggers the Fourth Amendment because, under such circumstances, no reasonable person would have felt free to go about her business. *See Jones ex rel. Jones v. Webb*, 45 F.3d 178, 182 (7th Cir.1995) (holding that individual was seized upon being physically

*sub nom. Rogan v. Evans,* 528 U.S. 1062, 120 S.Ct. 616, 145 L.Ed.2d 511 (1999):

(1) the case must be sufficiently advanced in terms of pretrial discovery for the summary judgment target to know what evidence likely can be mustered, and (2) the target must have received appropriate notice. Notice, in this context, has two aspects: the summary judgment target is entitled to know both the grounds that the district court will consider and the point at which her obligation to bring forth evi-

dence supporting the elements of her claim accrues.

*Id.* at 79 (citations omitted).

17. Strahan makes reference to repeated arrests in violation of his Fourth Amendment and free speech rights since 1992. *E.g.*, Strahan Aff. ¶¶ 17, 18, 21. Strahan makes no effort, however, to describe these occurrences with any factual specificity. Accordingly, this Court disregards these allegations as being merely conclusory and not factually supported.

restrained and forcibly removed from the premises); *Taylor v. Collins*, No. C–3–92–121, 1998 WL 1657173, at *3 (S.D.Ohio Aug. 6, 1998) (holding that reasonable minds could conclude that physical contact in removing individual from stadium constituted a seizure). Because this Court concludes that the Fourth Amendment was triggered, it must now examine whether there is a dispute as to a material fact that the Fourth Amendment was violated.

 The two remaining tiers of Fourth Amendment analysis are (1) investigative or *Terry* stops, requiring reasonable suspicion, and (2) arrests and de facto arrests, requiring probable cause. *Young*, 105 F.3d at 6. Investigative stops need only be reasonable under the circumstances. The determination whether an investigative stop is reasonable turns on two factors: (1) "whether the officer's action was justified at its inception"; and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. 1868. To satisfy the first prong, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion," *id.* at 21, 88 S.Ct. 1868; *accord Young*, 105 F.3d at 7 (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868). To satisfy the second prong, courts must examine the totality of the circumstances. *Young*, 105 F.3d at 7. Probable cause is a higher standard. Probable cause exists if at the moment of arrest "the facts and circumstances within [the police officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that" the arrestee had committed or was committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

 The determination whether a particular seizure is an investigative stop or a de facto arrest is a fact specific inquiry. In making this determination, the Court must ask "whether 'a reasonable man in the suspect's position would have understood his situation,' in the circumstances then obtaining, to be tantamount to being under arrest." *United States v. Zapata*, 18 F.3d 971, 975 (1st Cir.1994) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138 (1984)). Factors that can transform a mere investigative stop into a more coercive de facto arrest include physical contact, *id.* at 977 n. 4, the length of the detention, and the use of handcuffs, *United States v. Acosta–Colon*, 157 F.3d 9, 15, 18 (1st Cir.1998). When these "arrest like" characteristics exist, the police officers must be able to point to "specific facts or circumstances which could have led [them] reasonably to believe that the use of such measures was required to effectuate safely the contemplated investigation." *Id.* at 21 (emphasis omitted).

 Because the parties present dramatically different factual accounts of Strahan's ultimate departure from the Plaza, this Court does not decide whether the Police Defendants' actions amounted to a less intrusive investigative stop or rose to the level of a de facto arrest. Indeed, it is not necessary to decide this issue because, taking Strahan's version of the 2000 incident as true, the Police Defendants' actions were not even supported by reasonable suspicion.

The applicable statute for criminal trespass is Massachusetts General Laws ch. 266, § 120. It provides:

Whoever, without right enters or remains in or upon the ... buildings ... of another ... after having been forbidden so to do by the person who has

lawful control of said premises, whether directly or by notice posted thereon ... shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than thirty days or both ....

*Id.* In essence, anyone who remains without right on the property of another, after being told to leave, violates the statute.

The Police Defendants, pointing to this statute, argue that they had probable cause to arrest Strahan for criminal trespass. Defs.' Mem. at 12–13. The Police Defendants rely on the fact that the representatives of the Plaza explicitly advised the officers that they wanted Strahan to be removed from the premises.

The Police Defendants do not, however, account for this Court's present holding that Strahan had a constitutional right under the Massachusetts constitution peacefully to solicit signatures for an initiative petition in the private shopping mall. Property owners may not rely on the criminal trespass statute to circumvent constitutional protections. *Alexis v. McDonald's Rests. of Mass., Inc.,* 67 F.3d 341, 350 (1st Cir.1995).

> The words 'without right' in the context of the historical concept of trespass can only mean: without any legal right; without any right, permission or license recognized by law as permitting an entry into the area described in the statute.... The concept legal right in the context of today's constitutional developments includes any right of the plaintiffs ... found in the Constitution of the United States.

> . . . . .

Here we do not have a statute purporting to bar exercise of constitutional rights. As used in the trespass statute,

the words 'without right' expressly save constitutional rights.

*Hurley v. Hinckley,* 304 F.Supp. 704, 710 (D.Mass.1969) (Murray, J.), *aff'd sub nom. Doyle v. O'Brien,* 396 U.S. 277, 90 S.Ct. 603, 24 L.Ed.2d 469 (1970) (per curiam); *see also Commonwealth v. Wolf,* 34 Mass. App.Ct. 949, 951, 614 N.E.2d 679 (1993) ("The words 'without right' in the trespass statute ... connote the absence of any right, permission, or license recognized by law as permitting an entry into an area described by the statute." [citing *Hurley,* 304 F.Supp. at 710] ); *Commonwealth v. Lapon,* 28 Mass.App.Ct. 681, 683, 554 N.E.2d 1225 (1990) ("No doubt the words 'without right' ... encompass constitutional rights ...." [citing *Hurley,* 304 F.Supp. at 710–11] ).

Thus, if, as Strahan alleges, he was peacefully gathering signatures for his initiative petition and the Plaza sought to have him removed on that ground alone, the Police Defendants would have had neither probable cause nor even a reasonable suspicion that would warrant forcibly removing Strahan from the premises. Because the parties' accounts of the events of October 31, 2000 are strongly divergent, however, there is a genuine dispute as to a material fact.

Accordingly, this Court denied summary judgment as to Strahan's claim under section 1983 alleging a violation of his Fourth Amendment rights as a result of this 2000 incident.

D. *Suit Against the Police Defendants in Their Individual or Official Capacities*

Strahan brings his claims against the Police Defendants in both their individual and official capacities. Compl. ¶¶ 5–8.[18]

---

**18.** Although the Court stated at the hearing on Strahan's motion for a preliminary injunction that it appeared that Strahan was only suing the Police Defendants in their official

The Police Defendants argue that Strahan has not properly alleged or factually supported a claim against them in their official capacities. This Court concludes, however, that Strahan's complaint adequately avers, Compl. ¶ 16, and his affidavit sufficiently supports for purposes of summary judgment, Strahan Aff. ¶ 24, a claim against the Police Defendants in their official capacities.

 Strahan's claims against the Police Defendants in their official capacities are treated like claims against the City of Braintree itself. *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Am. Policyholders Ins. Co. v. Nyacol Prods., Inc.,* 989 F.2d 1256, 1259 (1st Cir.1993). For a plaintiff to prevail on a claim of municipal liability under section 1983, she must establish both that (1) there was a municipal custom or policy of deliberate indifference to the commission of constitutional violations by police officers, and (2) this custom or policy was the cause of, and moving force behind, the particular constitutional deprivation of which he is complaining. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Foley v. City of Lowell,* 948 F.2d 10, 14 (1st Cir.1991).

 Although the Police Defendants argue that Strahan has no evidence to support the conclusion that the Town of Braintree has a custom or policy of infringing on the free speech or Fourth Amendment rights of individuals gathering initiative petitions, Strahan has presented, in his affidavit, adequate evidence to survive a motion for summary judgment. There, Strahan states that in a conversation involving him, Sergeant Sanderson, and Chief Frazier, Sergeant Sanderson informed him that "it was the official policy of the Braintree police department that no one could collect signatures on ballot question[s] at South Shore Plaza unless the management allowed it" and that "anyone would be arrested for trespassing at South Shore Plaza who was there after being told to leave by the management, regardless of the reason." Strahan Aff. ¶ 24. This statement, if true, is direct evidence that Braintree's Chief of Police harbored a policy of arresting individuals for exercising their constitutional rights and that this policy was the underlying force behind Strahan's seizure on October 31, 2000. Thus, this statement is sufficient to create a dispute of material fact as to whether Braintree did in fact have such a policy aimed at violating individuals' rights under the Massachusetts constitution. *See Bordanaro v. McLeod,* 871 F.2d 1151, 1157–58 (1st Cir.1989).

 Accordingly, this Court held that Strahan's remaining claims under section 1983 and the Massachusetts Civil Rights Act[19] could be maintained against the Police Defendants in both their individual and official capacities.[20]

---

capacities, Prelim. Inj. Hr'g Tr. at 19, re-examination of the complaint reveals Strahan's explicit intention to sue the Police Defendants in both their individual and official capacities.

19. Because the Police Defendants have not raised the issue whether a municipality should be considered a "person" for purposes of liability under the MCRA, the Court does not now resolve the matter. *See Swanset Dev. Corp. v. City of Taunton,* 423 Mass. 390, 391,

668 N.E.2d 333 (1996) (leaving this question open).

20. Chief Frazier and Sergeant Sanderson further argue that the Court should grant summary judgment to them because Strahan cannot show either that they were directly involved in the alleged incidents or that they are liable on a theory of supervisory liability. Defs.' Mem. at 8 n. 3.

A supervisor cannot be held liable on a theory of respondeat superior under section

## E. *Section 1985* [21]

This Court assumes that Strahan brings his section 1985 claim under the deprivation clause of section 1985, which provides that:

If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

■ A cause of action under section 1985(3) has four elements: (1) the existence of a conspiracy of two or more persons; (2) a conspiratorial purpose to deprive, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws; (3) one or more of the conspirators must have done or caused to be done an act in furtherance of the object of the conspiracy; and (4) the plaintiff must have suffered either an injury to person or property or a deprivation of a constitutionally protected right or privilege as a result of the conspiracy. *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996) (citing *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)).

■ In *Griffin,* the Supreme Court interpreted the second element as requiring that the conspirators' action be motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin,* 403 U.S. at 102, 91 S.Ct. 1790. Thus, in lieu of a charge of racial animus, Strahan must allege some discrim-

---

1983. Rather, a supervisor is only liable for her own acts or omissions. Thus, "[a] plaintiff must show an 'affirmative link' between the subordinate officer and the supervisor, 'whether through direct participation or through conduct that amounts to condonation or tacit authorization.'" *Carmona v. Toledo,* 215 F.3d 124, 132 (1st Cir.2000) (quoting *Camilo–Robles v. Zapata,* 175 F.3d 41, 43–44 (1st Cir.1999)); *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 562 (1st Cir.1989).

Although the Police Defendants argue that Strahan has no evidence to support Chief Frazier's and Sergeant Sanderson's liability, Strahan has presented adequate evidence in his affidavit. Strahan states that in a conversation involving him, Sergeant Sanderson, and Chief Frazier, Sergeant Sanderson said that "he was going to send someone over to arrest" Strahan. Strahan Aff. ¶ 24. The Court can reasonably infer from this statement that Chief Frazier and Sergeant Sanderson not only were deliberately indifferent to Strahan's unconstitutional arrest, but also that they in fact authorized such arrest. This is sufficient evidence to survive summary judgment. *See Lipsett v. Univ. of P.R.,* 864 F.2d 881, 902 (1st Cir.1988) (holding that supervisory encouragement of constitutional violation can give rise to supervisory liability).

**21.** It is not entirely clear from Strahan's complaint whether he actually intended to state a claim under section 1985. Although it is true that he indicates in his complaint that he is suing under 42 U.S.C. §§ 1981–1985, he makes no reference in his complaint to the specific elements of section 1985. Indeed, Strahan makes no mention of section 1985 or its elements in his opposition to the Police Defendants' motion for summary judgment. Nevertheless, because pro se plaintiffs are entitled to a liberal construction of the pleadings, this Court will examine whether Strahan has set forth a claim under section 1985 that survives summary judgment.

inatory class-based animus. *Romero–Barcelo v. Hernandez–Agosto,* 75 F.3d 23, 34 (1st Cir.1996). "The requirement that the discrimination be 'class-based' is not satisfied by an allegation that there was a conspiracy which affected the interests of a class of persons similarly situated with the plaintiffs. Rather, the complaint must allege facts showing that the defendants conspired against the plaintiffs because of their membership in a class and that the criteria defining the class were invidious." *Harrison v. Brooks,* 519 F.2d 1358, 1359–60 (1st Cir.1975); *LaManque v. Mass. Dep't of Employment & Training,* 3 F.Supp.2d 83, 91 (D.Mass.1998) (Lindsay, J.).

■■■ The Police Defendants argue that Strahan cannot factually support a claim under section 1985. The Court agrees. Strahan does not provide this Court with sufficient evidence of class-based animus to survive summary judgment. Strahan appears to argue that the relevant class consists of individuals who attempt to gather signatures for petitions in shopping malls. *See* Strahan Aff. ¶¶ 8, 10, 11, 16, 21; Compl. at 2, ¶ 16; Pl.'s Opp'n at 11, 15–16. This definition of a class is insufficient, however. In order for a class to be cognizable under section 1985(3), it must be defined by something other than its members' participation in conduct that the defendant disfavors. *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 269, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). It is not enough that the only shared character-

istic of a class is the harm inflicted upon them by the defendants. *Aulson,* 83 F.3d at 5. Yet this is exactly the class that Strahan is attempting to define: those individuals who want to petition in private shopping malls, but whom the police and mall officials prevent from doing so.

Moreover, even if the Court understood Strahan as alleging that his class was composed of members of GreenWorld, he does not present sufficient evidence to survive summary judgment. First, it is unclear at best whether political, let alone, environmental groups are cognizable classes under section 1985(3).[22] *Id.* at 6 & n. 3 (suggesting but not deciding that *any* political class is insufficiently distinctive and identifiable to be cognizable under section 1985[3] ). This Court need not resolve this issue, however, because Strahan does not set forth sufficient facts to support his merely conclusory allegations of class-based discriminatory animus against GreenWorld.

The Court must disregard Strahan's conclusory allegations of a class-based conspiracy against GreenWorld. For example, Strahan has made the following allegations in his complaint and affidavit:

> [T]he [Police] Defendants are unlawfully acting intentionally to stop Strahan and GreenWorld from peacefully gather[ing] signatures on their Initiative Petition in the common[ ] area of the [Plaza]. They are intentionally and unlawfully threatening the Plaintiffs with arrest for tres-

---

**22.** *Compare Harrison v. KVAT Food Mgmt., Inc.,* 766 F.2d 155, 160–62 (4th Cir.1985) (holding that section 1985[3] does not protect political affiliations), *Piacentini v. Levangie,* 998 F.Supp. 86, 91 (D.Mass.1998) ("To assess whether a person or identifiable group is a protected class falling within the scope of section 1985[3]'s protections, the First Circuit considers whether the person or the identifiable group would be subject to heightened scrutiny under the Equal Protection Clause."), *and Morales–Narvaez v. Rossello,* 852 F.Supp. 104, 114–15 (D.P.R.1994) (holding that a class based on political affiliation is not cognizable under section 1985[3] ), *aff'd,* 65 F.3d 160 (1st Cir.1995) (unpublished table decision), *with Westberry v. Gilman Paper Co.,* 507 F.2d 206, 210–15 (5th Cir.1975) (holding that an environmental group could be a class under section 1985), *withdrawn as moot,* 507 F.2d at 206.

pass, not only just to stop Strahan and GreenWorld from either asking for or renting donations to support their campaigns to protect endangered species. They do it simply out of a hateful animus towards Strahan and other members of GreenWorld and out of the whim of simply and unlawfully preventing access to the public forum of the Shopping mall.

Compl. ¶ 19.

The local management of the South Shore Plaza has adopted a hateful and violent attitude towards GreenWorld and especially me.

Strahan Aff. ¶ 11.

Every time that GreenWorld has attempted to peacefully gather signatures on our ballot question at the South Shore Plaza since 1992, we have routinely been physically blocked from doing so.

*Id.* ¶ 17. These allegations make no attempt to describe the alleged class-based animus with any factual specificity and hence are simply conclusory statements that are insufficient to survive summary judgment.

Setting these conclusory allegations aside, Strahan has adduced no evidence of a conspiracy motivated by class-based animus toward GreenWorld. The only specific factual support for his section 1985(3) claim is Lieutenant MacAleese's alleged

statement that "anyone from GreenWorld would 'get tossed.'" *Id.* ¶ 29. This statement, standing alone, is insufficient to support a claim under section 1985(3). First, it provides no evidence of a conspiracy on the part of the Police Defendants. Second, the Court has difficulty inferring a class-based animus specifically toward members of GreenWorld from this statement alone. This statement does not support the conclusion that the Police Defendants had animus toward members of GreenWorld because of this organization's environmental or political viewpoints; rather, it merely gives rise to the inference that the Police Defendants possessed an animus toward GreenWorld members because they are among the group of individuals that desire to petition in private shopping malls.[23] But this Court has already indicated that this broader class of "individuals wanting to petition in malls" is not cognizable under section 1985, and Strahan cannot circumvent this holding by simply pointing to a subset of this broader class. Thus, Strahan is unable to present a genuine dispute that the Police Defendants conspired against him because of his membership in GreenWorld or that the Police Defendants were motivated by an animus against GreenWorld itself.

Accordingly, this Court granted summary judgment to the Police Defendants on Strahan's claim under section 1985(3).[24]

---

**23.** Indeed, Strahan explicitly indicates this in his complaint:

Strahan, and other members of GreenWorld, presence in the Shopping Mall was openly accepted by the management of the Shopping Mall and the Defenda[n]ts, until they attempt to collect signatures on petitions, leaflet, or seek/accept donations in[ ] support of their campaign from willing members of the Public. Then they were ordered to stop and, when they declined to do so, they were thre[a]tened with arrest for

trespass if they did not leave immediately and if they ever cam[e] back again.
Compl. ¶ 21.

**24.** The Police Defendants also argue that Strahan does not state a claim under section 1985 on the ground that he is unable to support the existence of a conspiracy because a single government entity cannot conspire with itself. Because Strahan has not presented any evidence supporting a claim of class-based discrimination, this Court need not resolve whether the "intracorporate conspiracy doctrine," which states that a government

## V. Conclusion

For the foregoing reasons, the Court GRANTED in part and DENIED in part the Police Defendants' Motion for Summary Judgment [Docket No. 17].

entity cannot conspire with itself and its individual members, is applicable. *See Stathos v. Bowden*, 728 F.2d 15, 21 (1st Cir.1984) (recognizing that some circuits have applied an intracorporate conspiracy exception to suits under section 1985[3], but concluding that such an exception, if applied at all, should be applied narrowly).